UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER L. SCRUGGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00460-JRS-MJD |
| | ) | |
| MARY SIMS Dr., | ) | |
| KELLY INDA M.H.P., | ) | |
| D. RUSSELL Correctional Officer (Custody | ) | |
| Major), | ) | |
| MATT LEOHR Classification Officer, | ) | |
| JERRY SNYDER Unit Team Manager (S.C.U.), | ) | |
| CHRISTOPHER NICHOLSON (Lieutenant), | ) | |
| Correctional Officer, (S.C.U.), | ) | |
| DICK BROWN Warden, | ) | |
| FRANK LITTLEJOHN Asst. Warden | ) | |
| (Operations), | ) | |
| KEVIN GILLMORE Asst. Warden (Re-Entry), | ) | |
| WILSON Sgt., Correction Officer (Sergeant) | ) | |
| (S.C.U.), | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Defendants Sims and Inda's Motion for Summary Judgment**

Before the Court is the motion for summary judgment of Dr. Mary Ruth Sims and Kelly

Inda, mental health providers employed at the Wabash Valley Correctional Facility (WVCF).

Plaintiff Christopher L. Scruggs, an Indiana Department of Correction (IDOC) inmate incarcerated

at WVCF, brought suit against these defendants pursuant to 42 U.S.C. § 1983 for alleged violations

of his First and Eighth Amendment rights. For the reasons explain in this Order, the motion,

dkt. [80], is **granted**.

**I.  Pending Claims for Relief**

Mr. Scruggs alleges that Dr. Sims was deliberately indifferent to his serious medical needs

when she did not treat his mental illnesses. Dkt. 2 (complaint); dkt. 11 (screening order). He also

alleges that Dr. Sims and Ms. Inda retaliated against him for his writing grievances by causing him to be held in unsanitary conditions of confinement. *Id.* Although Mr. Scruggs asserts in his response to the pending motion for summary judgment that Ms. Inda was also deliberately indifferent to his serious medical needs, *see* dkt. 89 at 16, this claim was not discerned in the complaint during screening, *see* dkt. 11 at 2-3. A deliberate indifference to serious medical needs claim was allowed to proceed only against Dr. Sims. *Id.* Mr. Scruggs was allowed an opportunity to file a motion to reconsider or an amended complaint if he thought the Court overlooked a claim and/or defendant. *Id.* 3. He did not do so, and has never sought leave to file an amended complaint. Accordingly, Mr. Scruggs's allegations of deliberate indifference are considered as against Dr. Sims only.

## II. Summary Judgment Legal Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v.*

*Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015). This is in part because summary judgment is the "put up or shut up" moment in a lawsuit. *Grant*, 870 F.3d at 568.

## II. Material Facts

### B.      Material Undisputed Facts

Consistent with the legal standards set out above, the following facts are undisputed. *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014). That is, these statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to the non-moving party. *Whitaker v. Wisc. Dep't of Health Serv's,* 849 F.3d 681, 683 (7th Cir. 2017).[1]

At all times material to the issues in this lawsuit, Mr. Scruggs was incarcerated at WVCF, where Dr. Sims was employed as a psychologist and Ms. Inda was employed as a Licensed Mental Health Counselor. Dkt. 82-14; dkt. 82-1.

---

[1] In response to the defendants' motion for summary judgment, Mr. Scruggs posits thirty-four statements of disputed fact. Dkt. 89 at 2-7. He does not support any of the statements with a citation to the record or submitted evidence. Mr. Scruggs submitted 345 pages of exhibits with his response. Dkt. 90-1. To the extent any assertion of fact is not supported with a citation to the record, or is not otherwise known to be true for purposes of summary judgment, the Court will not root through the 345 pages of exhibits to find support for the assertion. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (court need not hunt for evidentiary support in submitted record).

Mr. Scruggs testified that he believes that he has been diagnosed with several mental health conditions, beginning in 2007 when he became incarcerated, but he does not know what these conditions are. Dkt. 82-25 at 10. (Scruggs deposition of Jan. 24, 2020). The first diagnosis was made while he was in the Marion County Jail, where he was prescribed the medications Elavil, Geodon, and another medication that countered the side effects of Geodon. *Id.* at 11-12. Mr. Scruggs also self-medicated with marijuana. *Id.* at 14. However, since 2007, he has not been prescribed mental health medications. *Id.* at 12-13, 15, 20.

Mr. Scruggs entered the IDOC in 2007 and was transferred in 2017 to WVCF where he has been since. He contends that he has not been prescribed any mental health medications since roughly 2007. *Id.* at 12-13, 15, 20.

In the IDOC, mental health codes are assigned to inmates to indicate the level or seriousness of mental illnesses. An "A" mental health code is assigned to inmates who are "free of mental illness requiring routine therapy or counseling." Dkt. 82-14 at ¶ 26.a. (Sims affidavit). During all times material to this action, Mr. Scruggs's mental health code was "A." *Id.* at ¶ 26. Dr. Sims does not believe that Mr. Scruggs's conditions fit the criteria for any other mental health code. *Id.* Mr. Scruggs has never been housed in a mental health unit during his IDOC incarceration. Dkt. 82-25 at 18, 22. At his deposition, Mr. Scruggs testified that "I know what's wrong with me, and I know I need help with it . . . ."  When asked what his mental health conditions were, Mr. Scruggs testified "I don't know." *Id.* at 52.

Mr. Scruggs has been housed only in the Secured Confinement Unit (SCU) or the Custody Confinement Unit (CCU) at WVCF. *Id.* at 18. Most of that time has been in the SCU, because his time in the CCU was only for approximately ten days. *Id.* at 18-19.  The CCU cells are slightly larger than the SCU cells. *Id.* at 27.

4

On May 7, 2018, Mr. Scruggs was placed on suicide watch and initially housed in a SCU holding cell. Dkt. 82-1 at ¶ 4 (Inda affidavit); dkt. 82-25 at 23, 40; dkt. 82-14 at ¶ 5. Mr. Scruggs testified that he requested to be placed on suicide watch "because the C.O. lied on me and said I hit him with a cup of water." Dkt. 82-25 at 40. Ms. Inda had been summoned to the SCU because Mr. Scruggs reportedly said that he was going to harm himself. Dkt. 82-1 at ¶ 4. When she arrived at the SCU, Mr. Scruggs was in a holding cell. *Id.* As she assessed Mr. Scruggs, he told her that he did not think of ways to harm himself. *Id.* at ¶ 4. But when asked what would happen if he was returned to his cell, Mr. Scruggs gave an evasive answer. *Id.* Ms. Inda asked Mr. Scruggs how he could "problem solve" to resolve his perceived threats, but Mr. Scruggs was not interested in the exercise. *Id.*

A suicide watch is when the patient is continuously observed following self-injurious behavior or other indications that a risk of self-injury is imminent. Dkt. 82-14 at ¶ 6. When a patient is placed on constant observation suicide watch, typically a suicide watch "companion "monitors the patient to ensure that the patient does not engage in self-injurious behavior. *Id.* at ¶ 7. If a suicide watch companion is unavailable or for some reason inappropriate, a member of the custody staff fills the same role in monitoring the patient. *Id.*

Removing a patient from suicide watch usually occurs in gradual stages. *Id.* at ¶ 8. When a patient is under constant observation, the first step in transitioning off of suicide watch is to change the "constant" observation to close observation. *Id.* Under close observation, there is no suicide watch companion, and a visual observation is done at staggered intervals averaging fifteen minutes. *Id.* In addition to being used as a step-down from constant observation, close observation is typically used for a patient who has not engaged in physical acts of self-injury but who staff believes may be at increased risk for self-injurious behavior. *Id.*

If a patient is on close observation suicide watch with no indication of self-injurious behavior, does not display warning signs or clinical indications of self-injurious behavior, and does not express an intention of self-harm, he may be transitioned off of suicide watch following a visit with a mental health clinician. *Id.* at ¶ 9.

Following removal from suicide watch, the patient is seen for a one-day post-suicide-watch follow-up assessment, one-week follow-up, two-week follow-up, and four-week follow-up. *Id.* at ¶ 10. During each visit, so long as the patient has no clinical indications of an intent to engage in self-injurious behavior, or show other concerning clinical symptoms, the patient is seen according to a post-suicide-watch timeline. *Id.* If at any time the patient displays warning signs or communicates an intent to self-harm, the patient can be returned to suicide watch to protect his health and well-being. *Id.*

The goal of the suicide watch protocol is to protect the patient from self-injurious behavior. *Id.* at ¶ 11. The protocol implements a gradual transition off of suicide watch to monitor the patient for signs of suicidality and slowly reintegrate the patient back to his normal housing assignment, which is determined by custody staff. *Id.* While on suicide watch – whether constant or close observation – the patient is seen daily to assess mental health needs. *Id.* at ¶ 12. In May 2018, the nursing staff also conducted periodic checks for patients placed on suicide watch. *Id.*

Mr. Scruggs testified that prior to May 2018, he had been placed in a holding cell seven or eight times for suicide watch. Dkt. 82-25 at 25. During these stays, mental health staff "may [have] come by once a day." *Id.* at 26.

When offenders in SCU are placed on a suicide watch, they are typically placed in the SCU holding cells. Dkt. 82-1 at ¶ 21. There are four SCU holding cells, each located at the entrance of the four SCU pods (A-East, A-West, B-East, and B-West). *Id.* The cells have a combination

sink/toilet, an elevated ledge, a light, and a windowed door. *Id.* The combination sink/toilet is the same as the combination sink/toilets in the regular SCU cells. *Id.*

The SCU holding cells are strip cells used for suicide watch, which in part limits the implements which can be used to inflict self-harm. Dkt. 82-14 at ¶ 27. The overriding goal of suicide watch is to prevent self-injurious behavior. *Id.* Therefore, the patient is monitored either constantly or periodically. *Id.* The patient has access to a mattress at night to sleep. *Id.* The patient is provided a "suicide blanket." *Id.* But the patient is not given eating utensils, which could be fashioned into weapons. *Id.* These cells are not intended to punish. *Id.* Instead, a patient's placement in a SCU holding cell is intended to prevent suicidal and self-injurious behavior. *Id.*

The holding cells are smaller than the normal cells in SCU. Dkt. 82-1 at ¶ 21. However, there is enough room to walk around and lie down. *Id.* Holding cells are used for suicide watch, in part, to observe the patient. *Id.* The cells are located in high-traffic areas for staff, allowing frequent visual contact while a patient is on suicide watch. *Id.*

Dr. Sims testified in her affidavit that she did not observe any defects in Mr. Scruggs's cells during either of her clinical encounters with Mr. Scruggs in May 2018. Dkt. 82-14 at ¶ 27.

Mr. Scruggs was also assessed by Crystal Rinehart, a Licensed Clinical Social Worker, on May 9, 2018. *Id.* at ¶ 13; dkt. 82-15 (medical record). She saw him in the B-West holding cell for his daily suicide watch assessment, where he stated he was suicidal and had a plan to harm himself. *Id.* When pressed on his plans, however, Mr. Scruggs was again evasive with his answers. *Id.* As a result of Ms. Rinehart's encounter with Mr. Scruggs, he was kept on constant observation suicide watch. *Id.*

Mr. Scruggs was next assessed for suicide risk by Nurse Miller on May 10, 2018. Dkt. 82-14 at ¶ 14; dkt. 82-16 (medical record). Nurse Miller reported that Mr. Scruggs stated that he

had suicidal ideations and planned to kill himself slowly by maintaining his hunger strike, but he denied homicidal ideations. *Id.* Nurse Miller instructed that Mr. Scruggs should be continued on the current constant observations suicide watch. *Id.*

Ms. Rinehart again saw Mr. Scruggs on May 10, 2018, for his daily suicide watch visit. Dkt. 82-14 at ¶ 15; dkt. 82-17 (medical record). Again, Mr. Scruggs said his plan was to starve himself to death. *Id.* Accordingly, Mr. Scruggs was maintained on the constant observation suicide watch. *Id.*

Mental health extern Ryan Kulynych visited Mr. Scruggs on May 11, 2018. Dkt. 82-14 at ¶ 16; dkt. 82-18 (medical record). Mr. Kulynych offered to visit with Mr. Scruggs in the CCU interview room, but Mr. Scruggs refused the offer. *Id.* Mr. Scruggs indicated that he would not participate in further mental health visits while he was on suicide watch, and that he planned to use the suicide watches as a means to obtain a transfer to a different IDOC facility. *Id.* Additionally, Mr. Scruggs indicated that he was suicidal and planned to starve himself to death. *Id.* Accordingly, Mr. Scruggs was maintained on constant observation suicide watch. *Id.*

The next day, May 12, 2018, Mr. Scruggs was seen and assessed by Nurse Bevera Hooper. Dkt. 82-14 at ¶ 17; dkt. 82-19 (medical record). Nurse Hooper recorded that Plaintiff appeared depressed, had significant cognitive issues, and "[s]uicidality is significant and improved." The medical record also indicated that Mr. Scruggs had a moderately "[i]mpaired ability to make reasonable decisions." *Id.* during this visit and his affect appeared constricted. Dkt. 82-19 at 2. Nurse Hooper called Dr. Sims and, and based on her report that Mr. Scruggs appeared depressed, Dr. Sims ordered that Mr. Scruggs be maintained on constant observation suicide watch. Dkt. 82-14 at ¶¶ 17, 23; dkt. 82-19.

On May 13, 2018, Nurse Regina Robinson saw and assessed Mr. Scruggs for suicidality. Dkt. 82-14 at ¶ 18; dkt. 82-20 (medical record). Nurse Robinson recorded that Mr. Scruggs's mood was euthymic, his affect was full, and he said that he was doing better. *Id.* But when Nurse Robinson asked him if he had an intent to harm either himself or others, Mr. Scruggs was evasive. *Id.* Mr. Scruggs was maintained on constant observation suicide watch following Nurse Robinson's assessment during this clinical encounter. *Id.*

The next day's assessment, on May 14, 2018, was conducted by Ms. Kulynych. Dkt. 82-14 at ¶ 19; dkt. 82-21 (medical record). Mr. Scruggs was seen in the CCU Interview Room and said that he had gone on suicide watch to prove a point. *Id.* Mr. Scruggs denied thoughts of self-harm and denied an intent to harm others. *Id.* Ms. Kulynych recorded that Mr. Scruggs's behavior appeared goal oriented. *Id.* She contacted Dr. Sims about her interaction with Mr. Scruggs, indicating that she believed Mr. Scruggs should be transitioned to close observation suicide watch. Dkt. 82-14 ¶ 19; dkt. 92-21. Dr. Sims agreed to this plan. *Id.* Accordingly, Mr. Scruggs was transitioned from constant observation suicide watch to close observation suicide watch. *Id.*

Defendant Dr. Mary Sims is an Indiana licensed psychologist who is qualified to assess, diagnose, and treat mental health and behavioral disorders. Dkt. 82-14 at ¶ 1. During this time in May 2018, Dr. Sims had her first face-to-face encounter with Mr. Scruggs on May 15, 2018. *Id.* at ¶ 20; dkt. 82-22 (medical record). Dr. Sims told Mr. Scruggs that he would be returned to SCU after he was removed from suicide watch. *Id.* at ¶ 20; dkt. 82-22. This placement was in line with custody staff's classification criteria and also satisfied Mr. Scruggs's mental health code of A. *Id.* But Mr. Scruggs told her that he would harm himself if returned to the SCU, stating that custody staff was playing in his food, messing with his mail, and improperly spraying him with chemical agents. *Id.* Mr. Scruggs also added that he was now being attacked for his Kosher diet. *Id.* Finally,

Mr. Scruggs said that his placement on suicide watch interfered with his ability to conduct legal work. *Id.* Dr. Sims told Mr. Scruggs that it was her opinion that he was not mentally ill, but that his insistence for placement on suicide watch was the means he had chosen to voice his displeasure of and protests to the threats he thought existed in the SCU. *Id.* But, because of Mr. Scruggs's statements that he would harm himself if returned to the SCU, Mr. Scruggs was maintained on close observation suicide watch. *Id.* Dr. Sims saw in the medical records that Mr. Scruggs had committed acts of self-harm in 2013 "to make a scene." *Id.*

The next day, May 16, 2018, Mr. Scruggs was again assessed by Ms. Kulynych. Dkt. 82-14 at ¶ 21; dkt. 82-23 (medical record). Mr. Scruggs was again given the opportunity to do the assessment in the CCU interview room but refused to leave his cell without his suicide blanket. *Id.* During the assessment at Mr. Scruggs's cell, he denied thoughts of or intent to commit self-harm. *Id.* Ms. Kulynych continue close observation suicide watch for Mr. Scruggs and encouraged him to attend his daily visit scheduled for the following day. *Id.* Ms. Kulynych noted in the medical record that Mr. Scruggs did not present with any symptoms of a diagnosable mental illness. *Id.* Finally, Ms. Kulynych again noted that she perceived Mr. Scruggs's behavior to be goal-directed in nature. *Id.*

Dr. Sims had her second face-to-face evaluation of Mr. Scruggs on May 17, 2018. Dkt. 82-14 at ¶ 22; dkt. 82-24 (medical record). Mr. Scruggs refused to leave his cell to attend this visit, stating that he was happy in his cell and that he felt threatened by the officers. *Id.* Due to his refusal to attend this visit, the suicide precautions were maintained and Mr. Scruggs was kept on close observation suicide watch. *Id.*

Ms. Inda assessed Mr. Scruggs the next day, on May 18, 2018. Dkt. 82-1 at ¶ 5; dkt. 82-3 (medical record). This encounter occurred in a SCU holding cell, where Mr. Scruggs had been

moved to from the CCU the day before. *Id.* Ms. Inda saw that Mr. Scruggs and his suicide watch companion were chatting upon her arrival. *Id.* Mr. Scruggs told her that he was not suicidal when he previously communicated that he was going to hurt himself. *Id.* Instead, Mr. Scruggs told her that he had done all of this "for the hell of it." *Id.*

However, when Ms. Inda asked Mr. Scruggs whether he had any suicidal ideations or thoughts, Mr. Scruggs said that he did. *Id.* Accordingly, Mr. Scruggs was placed on constant observation suicide watch out of concern for self-injurious behavior. *Id.* Ms. Inda placed a sign on Mr. Scruggs's cell door instructing that there be limited communication between him and his suicide watch companions. *Id.* Ms. Inda had reason to believe that conversations between a patient and a suicide watch companion actually increases the risk of self-injurious behavior when its purpose is a secondary gain. *Id.*

"Secondary gain" is when a suicidal patient's self-injurious behavior is done for a reason other than suicide. Suicide attempts are thus a pretextual reason to obtain something else. *Id.* In this case, Mr. Scruggs has been housed in the SCU since his transfer to WVCF. *Id.* Both the SCU and CCU contain one-man cells. *Id.* It is not uncommon for WVCF patients in the SCU or CCU to report suicidal ideations in order to be placed on constant observation suicide watch and gain access to suicide watch companions. *Id.*

Ms. Inda next assessed Mr. Scruggs suicidality four days later, on May 22, 2018, in the A-East holding cell. Dkt. 82-1 at ¶ 8; dkt. 82-5 (medical record). Ms. Inda recorded that the SCU Unit Team Manager reported that Mr. Scruggs could participate in the ACT class if he behaved himself and did not receive conduct reports. *Id.* Therefore Ms. Inda asked Mr. Scruggs if he had suicidal ideations. *Id.* He said that he did not. *Id.* Further, Ms. Inda did not observe any concerning

behaviors during this interaction to suggest that Mr. Scruggs was suicidal or depressed. *Id.* Accordingly, Mr. Scruggs was transitioned to close observation. *Id.*

Also during this May 22, 2018, assessment, Ms. Inda spoke with Mr. Scruggs about a previously submitted request for health care ("RFHC") number 295812. Dkt. 82-1 at ¶¶ 9 & 19; dkt. 82-6. Specifically, Ms. Inda asked Mr. Scruggs about his claim that being in SCU made him suicidal and that he felt as though he was being coerced into saying he was not suicidal. Dkt. 82-1 at ¶ 9; dkt. 82-6. Ms. Inda told Mr. Scruggs that he was placed on suicide watch for his protection, and that he had been seen daily by mental health staff, including her and Dr. Sims, and offered mental health counseling and assessment. *Id.* She told Mr. Scruggs that he displayed a complete lack of interest in the mental health counseling offered to him. *Id.*

Ms. Inda next evaluated Mr. Scruggs for suicidality on May 23, 2018. Dkt. 82-1 at ¶ 10; dkt. 82-7 (medical record). Mr. Scruggs denied suicidal thoughts or plans to harm himself, and Ms. Inda did not observe any behaviors to suggest otherwise. *Id.* Thereafter, Mr. Scruggs was removed from suicide watch. *Id.* He was told that he would be seen the following day for his initial post-suicide-watch visit, and that the visit could be conducted either in his cell or at a nearby holding cell. *Id.* Mr. Scruggs indicated that he did not have a preference. *Id.*

The next day, May 24, 2018, Ms. Inda assessed Mr. Scruggs for suicidality in his initial post-suicide watch assessment. Dkt. 82-1 ¶ 11; dkt. 82-8 (medical record). Mr. Scruggs denied suicidal and self-injurious ideations. *Id.* Notably, Ms. Inda did not observe alarming signs such as a limited range of emotion, a depressed mood, or a limited affect. *Id.* Instead, Ms. Inda observed an impulsivity that was consistent with her previous clinical encounters with Mr. Scruggs. *Id* It was decided that Mr. Scruggs would not be returned to suicide watch and instead would be seen for periodic post-suicide-watch assessments. *Id.*

One week later, on May, 31, 2018, Ms. Inda assessed Mr. Scruggs for suicidality. Dkt. 82-1 at ¶ 12; dkt. 82-9 (medical record). Mr. Scruggs denied suicidal and self-injurious ideations, and when asked whether he had any intent or plan to harm others, he responded by stating that if he had such a plan, he would have acted on it then. *Id.* Dkt. 82-1 at ¶¶ 12-13; dkt. 82-9. As a result of this conversation, it was determined that Plaintiff should not be returned to suicide watch and instead would next be seen for his two-week post-suicide-watch visit. *Id.*

Also during the May 31, 2018, assessment, Ms. Inda also talked with Mr. Scruggs about another RFHC, number 289612, in which he requested information on Antisocial Personality Disorder. Dkt. 82-1 at ¶ 13; dkts. 82-9 & 82-10. Mr. Scruggs said that he once had such a document but that now he could not find it. Dkt. 82-10. Lastly, Ms. Inda provided counseling to Mr. Scruggs about his reported nightmares. Dkt. 82-1 at ¶ 13; dkts. 82-9 & 82-10.

On June 7, 2018, Ms. Inda saw Mr. Scruggs for a two-week post-suicide-watch visit. Dkt. 82-1 at ¶ 14; dkt. 82-11 (medical record). Mr. Scruggs refused to come out of his cell, so the visit was held at the cell door. *Id.* Mr. Scruggs reported no intent to harm himself, and Ms. Inda did not observe any behavior suggesting suicidality. *Id.* Given the lack of reported self-injurious intent or associated clinical symptoms, Ms. Inda noted that Mr. Scruggs would next be seen on his next scheduled post-suicide watch visit. *Id.*

Mr. Scruggs was then seen by Ms. Inda on June 20, 2018. Dkt. 82-1 at ¶ 15; dkt. 82-12. As had been the case for the past several visits, Mr. Scruggs denied suicidal ideation and any plan to harm himself, and Ms. Inda did not observe any behavior that Mr. Scruggs was depressed or suicidal. *Id.* Ms. India then reported that Mr. Scruggs would be next evaluated according to his Individualized Action Plan ("IAP"), or at his request. *Id.*

Ms. Inda saw Plaintiff several times in May and June 2018, during and after his placement on suicide watch. Dkt. 82-1 at ¶ 17. Mr. Scruggs was offered talk therapy several times, but he refused to engage in meaningful discussion regarding his mental health. *Id.* at ¶ 20. He often presented as hostile and demanding during his interactions, and he self-reported that he engaged in certain behavior to achieve secondary gain. *Id.* at ¶ 17.

When patients are placed on suicide watch, especially when they are under constant observation, mattresses are supposed to be removed from the suicide watch cells during the day. *Id.* at ¶ 18. But during Ms. Inda's May 21, 2018 visit with Mr. Scruggs, he barricaded himself in his cell using his mattress and suicide blanket. *Id.* When a mattress is misused in this manner, it is taken away to prevent harm to the patient and others. *Id.*

During the May 2018, interactions with Mr. Scruggs in the SCU, Ms. Inda did not observe any defects in Mr. Scruggs's cells. *Id.*

Dr. Sims evaluated Mr. Scruggs twice during his May 2018 suicide watch. Dkt. 82-14 at ¶¶ 20, 22, & 23; dkts. 82-9 & 82-10. Ms. Kulynych evaluated Mr. Scruggs three times during his May 2018 suicide watch. Dkt. 82-14 at ¶¶ 16, 19, & 21; Dkts. 82-5, 82-8, & 82-9. Neither Dr. Sims nor Ms. Kulynych observed any clinical symptoms indicating suicidality or serious mental illness. Dkts. 82-14 at ¶¶ 16, 19, 20, & 23; dkts. 82-5, 82-8, 82-9, 82-10, & 82-11.

In the sixteen days Mr. Scruggs was on suicide watch, his medical records indicate that he was assessed for suicidality by either nursing staff or mental health staff no fewer than forty-six times. *Id.* at ¶ 24. Mr. Scruggs was also seen by Ms. Inda an additional five times following his removal from suicide watch. *Id.;* dkt. 82-1; at ¶¶ 11, 12, 14, & 15; dkts. 82-8, 82-11, 82-12. In the total fifty-one clinical encounters in May and June 2018, no individual reported clinically significant symptoms which indicated self-injurious behavior or serious mental illness. Dkt. 82-14

at ¶ 24. Only Nurse Hooper noted that Plaintiff appeared to exhibit a depressed mood or restricted affect. *Id.* Finally, both Dr. Sims and Ms. Kulynych believed that Mr. Scruggs's behavior was driven by his desire for secondary gain. *Id.*

Mr. Scruggs has a history of being diagnosed with Antisocial Personality Disorder (ASPD). *Id.* at ¶ 25. Patients with ASPD tend to lie, break laws, act impulsively, and lack concern for their own safety and the safety of others. *Id.* The condition can be diagnosed in adulthood, and symptoms can fade over time. *Id.* Mr. Scruggs displays impulsivity at times. *Id.* Moreover, Mr. Scruggs admitted during his May 2018 suicide watch that he lied and attempted to manipulate the system in order to be placed on suicide watch for secondary gain. *Id.*

## B. Alleged Facts in Dispute

Mr. Scruggs, in response to Dr. Sims and Ms. Inda's statement of undisputed facts, asserts thirty-four statements of disputed facts. Dkt. 89 at 2-8. But none are both disputed and material. Many are legal arguments, conclusory allegations with no evidentiary support, or unrelated to the claims Mr. Scruggs has made against Dr. Sims and Ms. Inda.

One caveat to this observation is Dr. Sims's assertion in her affidavit supporting her motion for summary judgment that her job duties do not typically include responding to informal medical grievances and that she neither reviewed nor responded to any informal grievances submitted by Mr. Scruggs in May 2018. *See* dkt. 82-14 at ¶ 28. In his response to the motion, Mr. Scruggs takes issue with the statement and provides a copy of an IDOC "Request for Interview" form addressed to "Dr. S. ?" dated May 17, 2018, and stamped "Received" on May 17, 2018. Dkt. 90-1 at 2. The undated response to the Request for Interview reflects the printed name "Dr. Sims." The form's reason for request, presumably submitted by Mr. Scruggs, states:

> CCU Mental Health Doctor told me that if I don't say that I'm not suicidal when I
> am because I'm in continued fear of food poisoning and death, and pepper spray

attacks, that she will make me stay on this half [unintelligible] to keep me on a forever-strip cell. She is trying to black mail me into saying I'm okay with my mental when I'm not. [unintelligible] at SHU, I was suicidal and will harm myself [unintelligible] sent back. This lady is telling me U have to have to go try to kill myself I ever want my property back to do my legal work or hear the sound of music again. The doctor's words depress me.

Dkt. 90-1 at 2.

The "action" section of the form states, "I told you that you need to be not intending self-harm to be removed from suicide watch. The only way I know whether you intend self-harm is what you say to me or your behaviors." *Id.* The "action" line contains the printed name "Dr. Sims." *Id.*

In reply, Dr. Sims first contends that this form was not disclosed to the defense in discovery and that seeing it in Mr. Scruggs's response was the first time they had seen it. Attached to the reply, Dr. Sims has attached a supplement to her motion affidavit (dkt. 94-1). The affidavit adds that at the time the first affidavit was prepared, Dr. Sims had no memory of responding to the Request for Interview. After reviewing it and seeing her handwriting and printed name, she has a "vague recollection" of the document and her response. Dkt. 94-1 at ¶ 1. Because inmates should title their Request for Interviews as an "Informal Grievance," she treated this as a request for information rather than a grievance. *Id.* at ¶ 2. Dr. Sims acknowledges that "Mr. Scruggs appears to view his placement on suicide watch as a form of punishment" but she advised him that he would be returned to SCU when suicide precautions were removed. *Id.* at ¶¶ 2-4.

Whether this Request for Interview is relevant to an issue in this action is discussed below. Whether it should be disregarded because of a potential discovery violation does not need to be addressed.

**B.      Mr. Scruggs's Remaining "Facts"**

As noted at the beginning of this subsection, Mr. Scruggs's statements of disputed facts are either irrelevant, are not supported by the summary judgment evidence, make a legal conclusion rather than provide a fact, or draw an inference that is not reasonable. For example, the first asserted statement of disputed fact contends that Mr. Scruggs was taking medication for his mental health conditions but that the defendants claim he was taking medication only for ASPD. Mr. Scruggs fails to cite to evidence to support this assertion. But his own deposition testimony is that he has not been prescribed medication for any mental health condition since 2007, eleven years prior to the time period relevant to this action. *See* dkt. 82-52 at 12-15, 20 (Scruggs deposition). Anyway, the Court finds no statement of material fact asserted by the defendants that Mr. Scruggs was on medication for his ASPD at time relevant to this lawsuit.

Mr. Scruggs also takes issue with Dr. Sims's statement that ASPD is not treated with medication but through talk-therapy. *See* dkt. 82-14 at ¶ 25 (Sims affidavit). Mr. Scruggs goes so far as to argue that Federal Rule of Civil Procedure sanctions 11 are warranted against the defendants for positing such a statement. *See* Dkt. 89. But Mr. Scruggs cites to no *evidence* to demonstrate that the statement made was false, and arguments about its relevancy are lacking as well. The Court must infer that Mr. Scruggs's generalized statement about medication issues for this ASPD is a point he argues in support of his deliberate indifference claim.

Additional discussion of Mr. Scruggs's asserted statements of disputed facts may be set out in the Analysis section below.

### III. Analysis

**A.     Retaliation Claim**

To prevail on his First Amendment retaliation claim, Mr. Scruggs must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

Suspicious timing can be evidence of a causal connection, but "a causal connection can then be demonstrated by suspicious timing alone only when the . . . action follows on the close heels of protected expressions." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (addressing First Amendment retaliation claim in employment context). The Seventh Circuit "typically allow[s] no more than a few days to elapse" for actions to qualify as coming "on the close heels" of protected expression, although this is a "context-specific analysis with no formal legal rule." *Id.*

But even if the grievance "play[ed] a part in that decision" to retaliate, no First Amendment violation occurred if "the same decision would have been reached" had Mr. Scruggs filed no grievance. *Winston v. Fuchs*, --- F. App'x ---, 2020 WL 7230248, at *2 (7th Cir. Dec. 8, 2020) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977)).

Mr. Scruggs's placement on and continuation of suicide watch was not motivated by any grievance. In his deposition, Mr. Scruggs testified that he was initially placed on suicide watch at his own request. Dkt. 82-25 at 40. This sworn deposition testimony is conclusive that no genuine issue of material facts exists to infer that Ms. Inda or Dr. Sims placed Mr. Scruggs on suicide watch in retaliation for any act of free speech.

As for his continued placement on suicide watch, the medical records demonstrate that in the sixteen days Mr. Scruggs was on suicide watch, he was assessed for suicidality "no fewer than forty-six times." Dkt. 84-14 at ¶ 24. In addition to the defendants, five other mental health providers or nurses (LCSW Rinehart, Nurses Miller, Hooper, and Robinson, and extern Kulynych) assessed Mr. Scruggs during this particular stay on suicide watch.[2] Each recommended, due to Mr. Scruggs's direct or evasive answers to questions about self-harm, that Mr. Scruggs remain on suicide watch.  There is no evidence that he was kept on suicide watch for any other reason, much less any improper reason.

Defendants Dr. Mary Sims and Licensed Mental Health Counselor Kelly Inda's May 11, 2020, motion for summary judgment, is **granted** on Mr. Scruggs's First Amendment retaliation claim.

### B.    Conditions of Confinement Claim

Mr. Scruggs Eighth Amendment conditions of confinement claim against all the defendants to this action is premised on being held in a small cell with only a "Chinese toilet," a lack of bedding, and the presence of insects.

Prisons must provide inmates with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Such necessities include "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Inmates are entitled to adequate opportunities for personal hygiene, including a right to regular showers and the right to basic hygienic supplies such as soap, toilet paper, and

---

[2] Mr. Scruggs testified in his deposition that he had been on suicide watch seven or eight other times. *See* dkt. 82-25 at 25.

toothpaste. *Jaros v. Illinois*, 684 F.3d 667, 670-71 (7th Cir. 2012); *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988).

Temporary neglect of an inmate's hygienic needs is insufficient to establish a constitutional deprivation. *Harris*, 839 F.2d at 1235-36 (keeping an inmate in a roach-infested cell and depriving him of toilet paper for five days and soap and toothpaste for ten days does not violate the Constitution); *Williams v. Bierman*, 46 F.3d 1134 (7th Cir. 1995) (denial of cleaning materials for two weeks does not violate the Constitution); *but see Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (pest infestation lasting sixteen months was a "prolonged deprivation seriously impacting [plaintiff's] health"); *Board v. Farnham*, 394 F.3d 469, 482 (7th Cir. 2005) (denying an inmate toothpaste for three and a half weeks was unconstitutional because adequate oral hygiene is necessary to prevent future medical illness, as evidenced by the plaintiff's subsequent tooth removal).

Mr. Scruggs's conditions of confinement claim fails against the medical defendants, the movants here, because (a) he has not provided evidence that he notified defendants Dr. Sims or Ms. Inda of any unconstitutional conditions of confinement, (b) the summary judgment record does not contain evidence that the conditions of confinement violated the Eighth Amendment in any event, and (c) he cannot identify who was responsible for the particular cell assignment.

In his deposition, Mr. Scruggs testified that while on suicide watch he was allowed to have "[a] blanket, a smock, and a mattress." Dkt. 82-25 at 57. Sometimes the mattress was taken away from him. *Id.* Mr. Scruggs testified that the floor did not have water on it, that it was "just nasty." *Id.* at 58. The holding cells, which Mr. Scruggs was in for just a portion of the sixteen days of suicide watch, the precise number of days unknown, were "[d]irty . . . mice running around . . .

spiders . . . bugs . . . ." *Id.* Mr. Scruggs is also unable to say who caused him to be moved to a holding cell. *Id.* at 60.

Mr. Scruggs's testimony about his cell conditions do not establish a genuine issue of material fact to suggest his conditions were unconstitutional. In *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015), the Seventh Circuit noted that "[p]est infestations may also form the basis of a[n] . . . Eighth Amendment conditions of confinement claim." However, the success or failure of such a claim is fact-sensitive. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (discussing significance of facts such as degree and duration of infestation and prison's abatement efforts). Here, the duration of time spent in the holding cells was minimal, there was no testimony or evidence to suggest an insect or rodent *infestation*, no evidence to suggest unsanitary conditions, and no evidence to suggest a lack of "reasonably adequate" bedding. Although Mr. Scruggs's mattress had been taken from him when he used it to barricade himself in the cell, there is no argument or evidence that this was an unconstitutional deprivation that caused the conditions of confinement to violate the Eighth Amendment.

Finally, in the daily suicide assessment reports prepared by the seven mental and health care providers, not one contains a reference or report that Mr. Scruggs complained of rodents, bugs, odors, the toilet, sleeping provisions, or size of the cell. *See* dkts. 82-3 – 82-13 & 82-15 –24.

Defendants Dr. Sims and Ms. Inda are **granted** summary judgment on Mr. Scruggs's conditions of confinement claim.

### C.    Deliberate Indifference

Mr. Scruggs's deliberate indifference to serious medical needs claim is made against Dr. Sims only and is based on her alleged failure to provide him mental health treatment. Dkt. 82-25 at 25; dkt. 2 (complaint); dkt. 11(screening order). This failure appears to be pled to

21

have occurred during the time period also relevant to the retaliation and conditions of confinement claim and centered on Mr. Scruggs's assertions about ASPD. The Court will also consider whether Mr. Scruggs's potential complaint of deliberate indifference to serious medical needs for his self-harm and suicide prevention needs could survive summary judgment, as the movants include such a claim in their motion. *See* dkt. 81 at 21.[3]

At all times relevant to Mr. Scruggs's claim, he was a convicted offender. Accordingly, his deliberate indifference claim is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, Mr. Scruggs must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) Dr, Sims knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an

---

[3] Defendants note that Mr. Scruggs has pled and testified that his threats of suicide and self-harm were not sincere, because he only intended to "prove a point." *See* dkt. 82-14 at ¶ 19; dkt. 82-21. They further note that if the threats were sincere, it was not deliberate indifference to maintain Mr. Scruggs on suicide watch for sixteen days, and that if the threats of suicide were not sincere, they were not a serious medical need.

objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "'the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)).

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. App'x 861 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Dr. Sims, for summary judgment purposes only, admits that ASPD is a serious medical need, and that threats of self-harm or suicide are also serious medical needs. *Id.* She argues, however, that Mr. Scruggs cannot show that she intentionally disregarded his serious medical needs during the relevant time period. *Id.* at 21-22. The Court agrees.

During the sixteen-day period in May 2019, Mr. Scruggs was seen by Dr. Sims twice, and had assessments for suicide each day by other providers, some of whom reported to and received treatment approval from Dr. Sims. There is no evidence that Dr. Sims intentionally ignored any possibility that Mr. Scruggs would commit an act of self-harm or commit suicide. To the contrary, prompt and extensive measures were taken by Dr. Sims and others, as precautions, to provide adequate medical (mental health) treatment to Mr. Scruggs.

Concerning Mr. Scruggs's inclusion of ASPD in his assertions against Dr. Sims, the allegations are vague as to what she did or did not do that constituted deliberate indifference. While the allegations may be vague, the evidence is not. Dr. Sims provides evidence that Mr. Scruggs has not been diagnosed with ASPD since he arrived in IDOC, and that the only suggestion he might have previously been so diagnosed is his own report that a doctor in the Marion County Jail made the diagnosis in 2003. *See* dkt. 82-25 at 14. Dr. Sims acknowledges, for purposes of summary judgment, that Mr. Scruggs medical history reflects a prior diagnosis of ASPD. Dkt. 82-14 at ¶ 25.

Dr. Sims testified that treatment for ASPD is talk therapy, not medications. Dkt. 82-14. Mr. Scruggs was offered counseling (talk therapy) during his sixteen-day stay on suicide watch, and he consistently refused the offers. Dr. Sims was not, as the summary judgment evidence shows, deliberately indifferent to Mr. Scruggs's serious medical needs as they concern any ASPD medical (mental health) needs.

Dr. Sims's motion for summary judgment on Mr. Scruggs's deliberate indifference to serious medical needs claim is **granted**.

24

### IV.   Conclusion

For the reasons explained above, the motion for summary judgment of defendants Dr. Mary Sims and Licensed Mental Health Counselor Kelley Inda, dkt. [80], is **granted**. Because other defendants remain in this action, no partial final judgement is necessary at this time.

The remaining defendants, all Indiana Department of Correction employees, did not seek summary judgment and remain in this action. Because this matter will be resolved by settlement or trial, the Magistrate Judge is requested to conduct a pretrial status conference at his earliest opportunity to discuss the potential for settlement and, if not settled, information about the trial of this matter at the Terre Haute, Indiana, United States Courthouse.

**IT IS SO ORDERED**.

Date: 12/29/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Christopher L. Scruggs
957096
Wabash Valley Correctional Facility - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

Bryan Findley
Indiana Attorney General
bryan.findley@atg.in.gov

Zachary Robert Griffin
Indiana Attorney General
zachary.griffin@atg.in.gov

Jarod Zimmerman
Katz Korin Cunningham, P.C.
jzimmerman@kkclegal.com

By electronic delivery:
    The Honorable Mark J. Dinsmore
    United States Magistrate Judge